FILED
2022 Sep-06  PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| ANTHONY IVEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00458-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Anthony Ivey filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits.  Doc. 1.  Plaintiff Ivey applied for disability benefits with an alleged onset date of December 7, 2015.  Doc. 11-4 at 2–5, 14–15.  The Commissioner denied Ivey's claim for benefits.  Doc. 11-3 at 27.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction.  Doc. 21.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Plaintiff Ivey argues that the court should reverse the

Commissioner's decision because substantial evidence does not support the decision of the Administrative Law Judge (ALJ).  Ivey argues that substantial evidence cannot support the ALJ's decision because the ALJ improperly discredited Ivey's subjective testimony regarding his pain and its limiting effects (Doc. 15 at 15), and because Ivey needed surgery (but was precluded from having surgery on account of issues with his worker's compensation claim), which prevented him from working. Doc. 15 at 11–15.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for

disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform."

*Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at

4

1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar).  If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.**  With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Plaintiff Ivey's personal and medical history

Plaintiff Ivey was born on May 5, 1982.  Doc. 11-7 at 2.  He was 37 years old when he applied for disability benefits.  Doc. 11-4 at 4.

On October 15, 2015, Ivey went to Family First Medicine, LLC in Rainsville, Alabama due to a back injury.  Doc. 11-8 at 55.  Ivey complained of pain in his neck, shoulder, arm, and upper back, as well tingling.  Doc. 11-8 at 55.  Ivey reported that

he had been picking up something heavy at work four days prior, then "heard a 'popping' noise," and had experienced symptoms ever since. Doc. 11-8 at 55. Ivey had tenderness around his upper back, but had no motor or sensory deficits and a normal spine exam. Doc. 11-8 at 56–58. Ivey had a normal gait, but had tenderness and spasm in his back. Doc. 11-8 at 60. Ivey was prescribed ibuprofen and Cyclobenzaprine and referred for an MRI. Doc. 11-8 at 60.

Ivey returned to Family First twice in October 2015, complaining of fatigue and continued pain, numbness, and tingling in his upper back, lower back, left hip, left arm, and left hand. Doc. 11-8 at 59, 62. Ivey stated that his symptoms were becoming more severe and were not helped by medication. Doc. 11-8 at 59, 62. Ivey had an antalgic gait with tenderness and spasm in his back, but no weakness or sensory deficits. Doc. 11-8 at 63.

On November 2, 2015, Ivey had an MRI of his left shoulder, which showed mild bursitis. Doc. 11-8 at 65. Ivey also got an MRI of his thoracic spine, which was normal. Doc. 11-8 at 66. Ivey had an MRI of his cervical spine, which showed normal alignment, largely normal discs, some mild/slight foraminal narrowing, a "tiny C5-6 disc protrusion with mild focal cord compression," and a "tiny C6-7 annulus tear." Doc. 11-9 at 88.

On October 31, 2017, Ivey saw Dr. James D. Smith at Gadsden Orthopaedics Associates, PC for low back pain and neck pain with numbness and tingling. Doc.

6

11-8 at 31.  Ivey told Dr. Smith that the injury had happened on October 12, 2015, while he was lifting windows at work.  Doc. 11-8 at 31.  Ivey stated that his pain was relieved by medication and worsened by working, walking, sitting or standing for long periods of time, squatting, weather, bending, running, and driving.  Doc. 11-8 at 31.  Dr. Smith noted that Ivey's pain caused him to wake at night but did not cause weakness or overall constitutional symptoms.  Doc. 11-8 at 33.  Dr. Smith also noted that Ivey had not worked in two years.  Doc. 11-8 at 33.  Ivey reported that he had headaches, visual disturbances, and memory loss.  Doc. 11-8 at 33.  Ivey had normal strength and some diminished sensation in his right leg.  Doc. 11-8 at 33.  Dr. Smith diagnosed Ivey with lumbar radiculopathy.  Doc. 11-8 at 34.

On December 5, 2017, Ivey had an MRI of his lumbar spine for low back pain.  Doc. 11-8 at 43.  The MRI showed a small right disk protrusion causing mild compression of a nerve root, but was "[o]therwise unremarkable."  Doc. 11-8 at 43.

On December 12, 2017, Ivey saw Dr. Smith for back pain and follow-up after his lumbar MRI.  Doc. 11-8 at 23.  Ivey reported to Dr. Smith that he was having lower back and right leg pain that woke him at night but caused no other "constitutional symptoms" and did not cause weakness.  Doc. 11-8 at 23.  Dr. Smith stated that an MRI showed some nerve root compression.  Doc. 11-8 at 23.  Dr. Smith noted that they would try physical therapy.  Doc. 11-8 at 23.  Dr. Smith also stated that he considered putting Ivey on "light duty," but instead placed him at full

duty "since there have really been no limitations on him for the last two years." Doc. 11-8 at 23. Ivey reported to Dr. Smith that his pain was worse with standing and activity. Doc. 11-8 at 23. Ivey had normal strength and mostly normal sensation. Doc. 11-8 at 23–24. He was diagnosed with lumbar radiculopathy, for which he was taking ibuprofen. Doc. 11-8 at 24.

On May 15, 2018, Dr. Smith noted that Ivey was having the same neck pain and left arm pain that he had been having since his work injury in 2015. Doc. 11-8 at 14. Dr. Smith stated that Ivey's pain was worse with activity but better with rest and medication, and that he had no new injury, no weakness, and no symptoms of myelopathy. Doc. 11-8 at 14. Dr. Smith noted that Ivey had normal range of motion, strength, and reflexes, but had some diminished sensation in his left arm and hand. Doc. 11-8 at 14–15. Ivey was encouraged to exercise regularly. Doc. 11-8 at 15.

On May 23, 2018, Ivey had an MRI of his cervical spine for neck pain. Doc. 11-8 at 41. The MRI showed normal alignment and some stenosis, some disc protrusion, and mild/minimal cord compression. Doc. 11-8 at 41–42.

On May 29, 2018, Ivey saw Dr. Smith with disc and nerve problems. Doc. 11-8 at 8. Dr. Smith diagnosed Ivey with cervical disc herniation, nerve root disorder, and spinal stenosis in the cervical region, and noted that Ivey was unable to work because of severe neck and arm pain. Doc. 11-8 at 8–9.

On September 24, 2018, Ivey saw Dr. Smith for constant neck pain that

worsened with movement.  Doc. 11-9 at 5.  Ivey stated that he had been in pain since an on-the-job-injury three years earlier, but that the pain had worsened.  Doc. 11-9 at 5.  Ivey requested cervical epidurals for pain.  Doc. 11-9 at 5.  However, Ivey reported no limitations and had normal range of motion and strength.  Doc. 11-9 at 5–6.  Dr. Smith diagnosed Ivey with cervical radiculopathy and cervical stenosis.  Doc. 11-9 at 6.  On September 28, 2018, Dr. Smith performed an epidural injection to help with Ivey's cervical radiculopathy.  Doc. 11-8 at 47; Doc. 11-9 at 25.

On October 8, 2018, Ivey had a follow-up appointment with Dr. Smith.  Doc. 11-9 at 8.  Ivey reported constant aching and burning pain in his neck at an intensity of 5 out of 10 that had not improved with treatment.  Doc. 11-9 at 8.  Dr. Smith opined that Ivey could return to work.  Doc. 11-9 at 8.  Dr. Smith suggested physical therapy.  Doc. 11-9 at 8–9.

On October 31, 2018, Ivey went to Family First with an ingrown toenail.  Doc. 11-8 at 70.  He had no lumbar tenderness or spasm, no weakness, and no sensory deficits.  Doc. 11-8 at 71.

On October 15, 2018, Ivey went to Advantage Physical Therapy LLC and received an evaluation and plan of care for his neck pain.  Doc. 11-8 at 156.  Ivey reported that his pain was usually between a 3-to-4 out of 10 and a 9 out of 10.  Doc. 11-8 at 156.  Ivey reported that he had trouble looking down, looking over his shoulder, and lifting a gallon of milk.  Doc. 11-8 at 156.  From October 15, 2018, to

December 20, 2018, Ivey regularly attended physical therapy at Advantage Physical Therapy.  Doc. 11-8 at 78–156.  He typically presented with pain in his cervical spine at a level of 4-to-6 out of 10 and had pain and wincing upon palpation of his cervical spine.  Doc. 11-8 at 78–156.

On November 14, 2018, Ivey saw Dr. Smith for a follow-up for his neck pain. Doc. 11-9 at 11.  Dr. Smith noted that Ivey still had pain at an intensity of 5 out of 10 that had not been helped by physical therapy.  Doc. 11-9 at 11.  Dr. Smith noted that Ivey had "[n]o functional limitations or restrictions," and could have returned to work in October 2018, but did not.  Doc. 11-9 at 11.  Dr. Smith noted that Ivey was "not interested in surgery."  Doc. 11-9 at 11.  Dr. Smith ordered an epidural steroid injection, which he performed.  Doc. 11-9 at 11–13.  Dr. Smith stated that Ivey could return to work on regular duty.  Doc. 11-9 at 12.

On May 1, 2019, Ivey saw Dr. Smith with continued neck pain at an intensity of 7 out of 10.  Doc. 11-9 at 13.  Ivey reported that his pain was worse with activity, and that physical therapy had not helped.  Doc. 11-9 at 13.  Dr. Smith noted that Ivey had no functional limitations or restrictions.  Doc. 11-9 at 13.  Ivey had normal range of motion, strength, sensation, and gait.  Doc. 11-9 at 14.  Dr. Smith repeated that Ivey could return to work.  Doc. 11-9 at 14–15.

On May 15, 2019, Ivey was officially discharged from physical therapy at Advantage Physical Therapy.  Doc. 11-8 at 75.  Ivey stated that his pain was at a 7

out of 10, but could sometimes be a 4 out of 10.  Doc. 11-8 at 75.  The discharge form stated that Ivey could return to work on a limited basis with limited lifting and head turning.  Doc. 11-8 at 75.

On May 29, 2019, Ivey again saw Dr. Smith for neck pain and cervical radiculopathy.  Doc. 11-9 at 16.  Dr. Smith again stated that Ivey could return to work at full duty with no functional limitations or restrictions.  Doc. 11-9 at 16–18.

On June 26, 2019, Ivey saw Dr. Smith again for neck pain and cervical radiculopathy.  Doc. 11-9 at 19.  Ivey reported that his pain was at an intensity of 8 out of 10.  Doc. 11-9 at 19.  He also reported frequent headaches.  Doc. 11-9 at 19. Ivey had normal range of motion, strength, sensation, gait, and coordination.  Doc. 11-9 at 20.  Dr. Smith stated that Ivey could return to work at full duty with no functional limitations or restrictions.  Doc. 11-9 at 20–21.

On July 31, 2019, Ivey returned to see Dr. Smith.  Doc. 11-9 at 22.  He reported his pain as being at an intensity of 7 out of 10.  Doc. 11-9 at 22.  Dr. Smith stated that Ivey could return to work full duty with no limitations.  Doc. 11-9 at 22. Ivey had normal range of motion, strength, sensation, gait, and coordination.  Doc. 11-9 at 23.

On September 12, 2019, Ivey filled out a function report related to his disability proceedings.  Doc. 11-7 at 23.  Ivey stated that he lived with his fiancée, and spent most of his days sitting or lying down and watching tv.  Doc. 11-7 at 23.

Ivey stated that getting dressed, bathing, and shaving all took more time because of his conditions. Doc. 11-7 at 24. He stated that his fiancée prepared their meals. Doc. 11-7 at 25. Ivey stated that he occasionally vacuumed for fifteen minutes about once a month. Doc. 11-7 at 25. He stated that he went outside once a day, could drive a car, and shopped for groceries and household items once or twice a month. Doc. 11-7 at 26. Ivey stated that he was able to pay bills and handle money. Doc. 11-7 at 26. Ivey stated that he experienced headaches and blurred vision. Doc. 11-7 at 27. He stated that his conditions affected his ability to lift—such that he could only lift about 15 pounds—and to squat, as well as his abilities to bend, stand, reach, walk, sit, kneel, climb stairs, see, and remember. Doc. 11-7 at 28. He stated that he sometimes had problems with falling, and that he could not "reach full length due to neck." Doc. 11-7 at 30. Ivey stated that he previously had worked in security and, from July 2015 to December 2015, had worked for a mill Doc. 11-7 at 31.

On May 29, 2019, Ivey saw Derok Cornwell, a physician's assistant at Gadsden Orthopaedics, for a follow-up after a cervical spine MRI for pain in his neck and arms. Doc. 11-8 at 5. The MRI showed mild cervical spondylosis with mild cord compression, but no weakness or signs of myelopathy. Doc. 11-8 at 5. Ivey was prescribed Norco, Medrol, and Cyclobenzaprine. Doc. 11-8 at 5–6.

On June 26, 2019, Ivey saw Dr. Smith for continuing symptoms in his neck. Doc. 11-9 at 19. He had normal range of motion, strength, gait, and coordination.

Doc. 11-9 at 19–20.  Dr. Smith cleared Ivey to return to work at full duty.  Doc. 11-9 at 21.

On July 31, 2019, Ivey saw Dr. Smith for neck pain at an intensity of 7 out of 10 that Ivey described as intermittent and worse with activity.  Doc. 11-9 at 50.  Ivey had normal range of motion, strength, sensation, gait, and coordination.  Doc. 11-9 at 51.

On September 25, 2019, Ivey saw Dr. Smith for his neck pain.  Doc. 11-9 at 47.  His pain was at an intensity of 8 out of 10 and worsened with activity.  Doc. 11-9 at 47.  Ivey had normal range of motion and strength, with some reduced sensation, and normal gait and coordination.  Doc. 11-9 at 48.  Dr. Smith stated that Ivey could return to work at full duty with no functional limitations or restrictions.  Doc. 11-9 at 49.  Dr. Smith ordered an MRI of Ivey's cervical spine.  Doc. 11-9 at 49.

On October 17, 2019, Ivey presented to the Dekalb Regional Medical Center Emergency Department in Fort Payne, Alabama with low back pain.  Doc. 11-9 at 30.  Ivey reported that his pain was acute, did not radiate, and was mild.  Doc. 11-9 at 31.  Ivey reported that he had been standing and felt a "catch" in his back.  Doc. 11-9 at 31.  Ivey reported pain in his low back both while moving and while at rest.  Doc. 11-9 at 31.  He had normal range of motion.  Doc. 11-9 at 31.  Ivey was diagnosed with a strained lower back.  Doc. 11-9 at 32.

On October 24, 2019, Ivey had an appointment with Dr. Andrew Hester at

Dekalb Orthopedics in Fort Payne, Alabama for a second opinion on his back pain. Doc. 11-9 at 81–82. Ivey was diagnosed with cervical and lumbar radiculopathy. Doc. 11-9 at 81. Ivey had tenderness in his upper back and some reduction in range of motion and strength due to pain. Doc. 11-9 at 83. Dr. Hester stated that Ivey could not perform any heavy lifting or vigorous physical activity due to his cervical and lumbar radiculopathy. Doc. 11-9 at 83.

On November 27, 2019, Ivey saw Dr. Smith for his neck pain and cervical radiculopathy. Doc. 11-9 at 44. He reported pain in his neck at a level of 8 out of 10 that worsened with activity. Doc. 11-9 at 44. He had normal range of motion and gait, with minimal loss of strength and sensation. Doc. 11-9 at 45. Dr. Smith noted that an MRI showed that Ivey's condition was largely unchanged, but that Ivey's symptoms had progressed to the point that Ivey wanted surgery. Doc. 11-9 at 46. Dr. Smith also stated that Ivey's "subjective complaints do correlate with the MRI results." Doc. 11-9 at 46. However, no surgery was scheduled. Doc. 11-9 at 46. Dr. Smith stated that Ivey could return to work with partial limitations, including that he should perform light duty only, could not lift, push, or pull over 5 pounds, and could not do any overhead work. Doc. 11-9 at 46.

On December 6, 2019, Ivey had an MRI of his cervical spine for neck pain. Doc. 11-9 at 76–77. The MRI showed normal alignment, some worsening bony foraminal stenosis, and worsening cord compression. Doc. 11-9 at 76–77.

On December 11, 2019, Ivey filled out a disability report.  He stated that his condition had gotten worse since summer 2019, with worse pain and problems gripping and lifting with his hands and pain affecting his left leg.  Doc. 11-7 at 50–51, 55.  Ivey stated that he was seeing a doctor for back, hip, leg, neck, and arm pain.  Doc. 11-7 at 53–54.  Ivey stated that he was taking medication in the form of Flexeril, Neurontin, Norco, and Voltaren.  Doc. 1–7 at 55.

On December 18, 2019, Ivey returned to Dr. Smith for his neck pain and cervical radiculopathy.  Doc. 11-9 at 42.  Ivey reported pain at an intensity of 8 out of 10 that worsened with activity.  Doc. 11-9 at 42.  Dr. Smith noted that Ivey was "[w]aiting on surgery approval," and stated that Ivey could return to work at light duty with no lifting, pushing, or pulling over 5 pounds, and no overhead work.  Doc. 11-9 at 42.  Ivey was advised to continue his medication for his pain.  Doc. 11-9 at 42.

## B.     Social Security proceedings

### 1.     Initial application and denial of benefits

In August 2019, Ivey filed applications for Disability Insurance Benefits and Supplemental Security Income, alleging a disability onset date of December 7, 2015.  Doc. 11-4 at 2–5, 14–15.  Ivey alleged that he suffered from a lower back injury, a neck injury, and mild spinal stenosis.  Doc. 11-4 at 4, 14.

In October 2019, Ivey's disability claims were initially denied based on a

15

finding that, in light of the evidence presented, Ivey was not disabled.  Doc. 11-4 at 2–3, 12, 22.  Non-examining state agency physicians determined that Ivey had few limitations and had the residual functional capacity (RFC) to, for instance, frequently lift 25 pounds, stand or walk 6 hours of an 8 hour workday, and push and pull without limitation.  Doc. 11-4 at 10–11, 20–22, 31–33.  Ivey requested reconsideration at the initial determination level.  Doc. 11-5 at 17–20.  In December 2019, Ivey's claims were again denied at the reconsideration level.  Doc. 11-4 at 34, 45.

On December 11, 2019, Ivey requested a hearing with an ALJ.  Doc. 11-5 at 26.

### 2.    ALJ hearing

On June 10, 2020, the ALJ conducted a telephonic hearing to determine if Ivey was disabled.  Doc. 11-3 at 32.

Ivey testified that he was not employed at the time of the hearing and had previously worked in security, driving around to different locations to monitor the security status of different buildings.  Doc. 11-3 at 36.  Ivey testified that he then worked at a lumber mill but was terminated after he had an accident there that resulted in a worker's compensation claim; that worker's compensation claim was pending at the time of the hearing, but had resulted in payment of some of Ivey's medical bills.  Doc. 11-3 at 37–38.

Ivey also testified that, at the time of the hearing, his medication consisted of

ibuprofen, Norco, Gabapentin, and Cyclobenzaprine, which he stated did not help his conditions but did help "kind of take the edge off." Doc. 11-3 at 38. He testified that he experienced drowsiness and some dizziness as side effects of his medications. Doc. 11-3 at 38. Ivey testified that he saw his orthopedist once every three months to get his prescriptions refilled, and had been to the orthopedist in March but did not have any real discussion with a physician at that time. Doc. 11-3 at 38–39. Ivey testified that his doctor had limited his lifting to five pounds. Doc. 11-3 at 39.

Ivey testified that he injured his neck while lifting panes of glass in his job at the lumber mill; he said that he felt something pop in his spine that went up to his neck and into his arms, and within a couple of days he had to go see a doctor. Doc. 11-3 at 40–41. Ivey testified that the doctor ordered him to be put on light duty, but the lumber mill did not honor that order, so he had to continue his duties and then hurt his lower back as well. Doc. 11-3 at 41. Ivey testified that his orthopedist, Dr. Smith, who also assessed him for the purpose of worker's compensation benefits, said that Ivey needed surgery on his neck at two levels, but Ivey stated that his worker's compensation coverage only would pay for surgery at one level, so he had not scheduled any surgery. Doc. 11-3 at 41–43. Ivey testified that he had no history of surgery, and that he only treated his pain with medication. Doc. 11-3 at 43. Ivey testified that he had endured three months of physical therapy, but that it had not helped his pain. Doc. 11-3 at 43.

Ivey testified further that he lived with his fiancée, who also was disabled. Doc. 11-3 at 44. Ivey testified that he was able to sweep, but could not bend down to use a dustpan, and could occasionally spray the yard. Doc. 11-3 at 45. He testified that about once or twice a week he drove to do errands, and he made a 30 to 45 minute car trip every 3 months for his doctor appointments. Doc. 11-3 at 45–46. Ivey stated that he did not socialize or enjoy activities. Doc. 11-3 at 46.

In response to questioning from his non-attorney representative, Ivey testified that his pain had increased since his injury—which took place in 2015—and that he had problems turning his head from side to side and looking up and down. Doc. 11-3 at 47. Ivey testified that he could not raise either arm over his head because of his pain, and that he had trouble reaching forward and to the sides. Doc. 11-3 at 47–48. Ivey testified that he could not squat down, and that he had trouble gripping items, such that he tended to drop things. Doc. 11-3 at 48. Ivey testified that he could only lift about 10 pounds with each arm, and that he had trouble bending at the waist. Doc. 11-3 at 49. He testified that he had constant back pain that radiated into his hip and leg. Doc. 11-3 at 19–50. Ivey testified that he could only walk about a quarter of a block at a time, and could only stand up for about 30 minutes at a time before having to sit down. Doc. 11-3 at 50. He stated that he also had trouble climbing stairs. Doc. 11-3 at 50. Ivey testified that, on average, he had to lie down and elevate his legs 2 or 3 times per day because of back pain, and needed to lie down for a

minimum of 30 minutes.  Doc. 11-3 at 51–52.

Ivey testified that he had constant pain that affected his concentration.  Doc. 11-3 at 52.  He also stated that he thought he would need to miss two or more days of work per month because of his pain.  Doc. 11-3 at 52.  Ivey stated that, if he worked, he would need more than 3 extra 15 to 20 minute breaks to get through a day.  Doc. 11-3 at 52–53.  Ivey testified that his doctor, Dr. Smith, had released him to return to work.  Doc. 11-3 at 53.  Ivey testified that he thought his employer had pressured Dr. Smith to do so.  Doc. 11-3 at 53.

A vocational expert (or "VE"), Darrington Crane, testified that a hypothetical individual with Ivey's age, education, work experience, and limitations could not perform Ivey's past relevant work, but that jobs at the sedentary level existed in significant numbers in the national economy that the hypothetical individual could perform.  Doc. 11-3 at 54–56.  Those jobs included order clerk, document preparer, and final assembler.  Doc. 11-3 at 56.  Crane testified that an individual can be off task up to ten percent of each day and can be absent one day per month without those limitations being work preclusive.  Doc. 11-3 at 56.  Crane also testified that, if a hypothetical individual was limited to only occasional reaching and handling with no overhead reaching, those limitations would be work preclusive.  Doc. 11-3 at 56.

### 3.    ALJ decision

On June 24, 2020, the ALJ entered an unfavorable decision.  Doc. 11-3 at 19–

27.  The ALJ found that Ivey "has not been under a disability, as defined in the Social Security Act, from December 7, 2015, through the date of this decision" (June 24, 2020).  Doc. 11-3 at 27.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Winschel*, 631 F.3d at 1178).  Doc. 11-3 at 20–21.  The ALJ found that Ivey met the requirements for insured status through December 31, 2020, and had not engaged in substantial gainful activity since December 7, 2015, the alleged onset date.  Doc. 11-3 at 21.  The ALJ also found that Ivey had severe impairments of "chronic C5-6 disc protrusion, moderate residual spinal stenosis, small L4-5 right disc protrusion, and early acromioclavicular arthropathy in the left shoulder."  Doc. 11-3 at 21.  The ALJ found that, based on the evidence from Ivey's MRIs, Ivey's medically determinable impairments "are severe because they constitute more than a slight abnormality and could reasonably be expected to have caused more than a minimal effect on the claimant's ability to perform basic work activities."  Doc. 11-3 at 22.  The ALJ determined that Ivey did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 11-3 at 22.

The ALJ also determined Ivey's RFC, finding that Ivey had the capacity to perform sedentary work with frequent reaching, handling or feeling bilaterally, no

overhead reaching, frequent use of ramps, occasional climbing of stairs, no other climbing, frequent balance, stopping, kneeling, crouching, or crawling, no concentrated exposure to extreme environments, and no unprotected heights.  Doc. 11-3 at 22.

The ALJ considered all of Ivey's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence, in accordance with the requirements of 20 C.F.R. §§ 404.1529, 416.929 and SSR (Social Security Ruling) 16-3p.  Doc. 11-3 at 23.  The ALJ also considered medical opinions and prior administrative medical findings.  Doc. 11-3 at 23.

In assessing Ivey's RFC and the extent to which Ivey's symptoms limited his function, the ALJ's decision stated that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  Doc. 11-3 at 23.  The ALJ then provided an in-depth summary of Ivey's medical history to explain the RFC determination.  Doc. 11-23–24.

The ALJ found that the opinions of the non-examining state agency physicians were not persuasive because they were inconsistent with the record as a whole, and

because subsequent evidence showed that Ivey only could perform sedentary work. Doc. 11-3 at 25.  The ALJ found that, "[a]fter a thorough review of the evidence of record," Ivey was capable of sustaining work consistent with the RFC determined in the decision, which provided accommodations and restrictions for his limitations. Doc. 11-3 at 25.

Based on the vocational expert's testimony, the ALJ found that, considering Ivey's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Ivey could perform.  Doc. 11-3 at 26.  Those jobs included order clerk, document preparer, and final assembler.  Doc. 11-3 at 26. Accordingly, the ALJ found that Ivey had not been disabled under the Social Security Act from December 7, 2015, through June 24, 2020.  Doc. 11-2 at 27.

### 4.    Appeals Council decision

Ivey requested that the SSA Appeals Council review the ALJ's decision.  Doc. 11-3 at 2, 13; Doc. 11-5 at 74.  On February 18, 2021, the Appeals Council denied Ivey's request for review, finding no reason to review the ALJ's decision.  Doc. 11-3 at 2.  Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

### DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal

standards.

## I. The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard." When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies. That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* 20 C.F.R. §§ 404.1529, 416.929 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard. In analyzing Plaintiff Ivey's RFC (residual functional capacity), and the extent to which Ivey's symptoms limited his functioning, the ALJ's decision

reasoned that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  Doc. 11-3 at 23.  Thus, the ALJ's decision was based on the proper legal standards.

## II.   Substantial evidence supported the ALJ's decision to discredit Ivey's subjective testimony regarding his pain and find that Ivey was not disabled.

Substantial evidence supported both the ALJ's decision not to credit Ivey's subjective testimony regarding his pain and the decision that Ivey was not disabled.

### A.   The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.  *Wilson*, 284 F.3d at 1225.  A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms

have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."    20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective.   20 C.F.R. § 404.1529.   Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage, and effects of his medications, and treatments or measures that he has to relieve the symptoms.  *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms." 20 C.F.R. § 404.1529(c)(4).  If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar).  "The credibility determination does not need to

cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

### B. The ALJ properly explained the decision not to credit Ivey's subjective testimony regarding his pain, and substantial evidence supported that decision.

The ALJ properly explained the decision to discredit Ivey's subjective testimony regarding his pain, and substantial evidence supported the ALJ's decision. Not only did the ALJ's decision articulate and track the multi-part "pain standard" (*see* Part I *supra*), but also the ALJ's decision tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed

---

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

above in Part II.A *supra*).  The ALJ analyzed the record according to the pain standard, assessed the evidence in determining whether Ivey's statements regarding the persistence, intensity, and limiting effects of his symptoms were consistent with the record, and provided an in-depth recitation of the evidence to explain why Ivey's testimony was not consistent with the record.  Doc. 11-3 at 23.

In finding that Ivey's testimony was not consistent with the record (and determining Ivey's RFC), the ALJ's decision stated that the ALJ had considered all of Ivey's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence, in accordance with the requirements of 20 C.F.R. §§ 404.1529, 416.929 and SSR 16-3p.  Doc. 11-3 at 23.  The ALJ then found that Ivey's "treatment records and diagnostic imaging do not indicate disabling functional limitations arising from his impairments."  Doc. 11-3 at 23.

The ALJ found that, in 2015 when Ivey visited Family First, he had pain and tenderness, but intact range of motion with no motor deficits and a steady gait.  Doc. 11-3 at 23.  The ALJ found that imaging in 2015 showed some abnormalities with Ivey's shoulder, a normal thoracic spine, and "a tiny C5-6 disc protrusion with mild focal cord compression as well as a tiny C6-7 annulus tear" in Ivey's cervical spine, but that at Ivey's follow-up appointment a week later he had full strength and reflexes throughout his extremities.  Doc. 11-3 at 23.

The ALJ found that medical records from May 2018 showed a cervical disc

herniation that was causing Ivey pain, but that Ivey had no arm weakness or myelopathy, had normal range of motion, and had full strength and reflexes. Doc. 11-3 at 24. The ALJ found that, at that point in time (May 2018), Ivey was prescribed pain medication, and regular exercise was recommended. Doc. 11-3 at 24. The ALJ found that an MRI showed disc protrusion and moderate spinal stenosis. Doc. 11-3 at 24. The ALJ found that, in September 2018, Ivey requested cervical epidurals, but that Ivey had no limitations and had full strength, normal muscle tone, a normal gait, and a largely normal spine. Doc. 11-3 at 24. The ALJ found that, at Ivey's appointments in October and November 2018, Ivey had no functional limitations and was found to be able to return to work. Doc. 11-3 at 24. The ALJ also found that, when Ivey had an appointment for an ingrown toenail, he did not report back problems and had good range of motion. Doc. 11-3 at 24. The ALJ found that Ivey went to physical therapy in 2018, but that Ivey testified that physical therapy did not help. Doc. 11-3 at 24.

The ALJ also found that, in June and July 2019, Ivey was found to have no functional limitations or restrictions and to be able to return to regular work. Doc. 11-3 at 24. The ALJ found that Ivey had a low back injury, but had only mild pain and was diagnosed with a strained muscle. Doc. 11-3 at 24. The ALJ stated that the non-examining state agency physicians found that Ivey had few physical limitations. Doc. 11-3 at 24. The ALJ found that Ivey's treating physician opined that he had

only partial limitations and cleared him to return to work, and that Ivey's physician had noted that Ivey had normal and stable shoulders, full strength and normal muscle tone, and a normal gait.  Doc. 11-3 at 24.  The ALJ also summarized Ivey's testimony that he occasionally could sweep, could not bend down, occasionally sprayed weeds, and drove once a week to the store.  Doc. 11-3 at 24.

The ALJ explained that he relied on the facts that, throughout Ivey's medical treatment during the relevant time period, Ivey's imaging showed some mild to moderate problems and abnormalities, but Ivey generally had normal range of motion, strength, reflexes, and gait with no weakness or myelopathy.  Doc. 11-3 at 23–24.  The ALJ also addressed the facts that Ivey often was found to have no limitations or restrictions, and that on multiple occasions Ivey's doctor cleared him to return to work with either no limitations or only partial limitations.  Doc. 11-3 at 23–24.

Furthermore, the ALJ did not entirely discredit Ivey's testimony about his pain and its limiting effects, but instead found that the record *did* support limitation to the level of sedentary work in order to accommodate his restrictions.  Doc. 11-3 at 22–25.  Indeed, Ivey's brief argues that his condition was "worsening" (Doc. 15 at 5, 14 (citations and quotation marks omitted)), and the ALJ's decision acknowledges the worsening nature of Ivey's symptoms; the ALJ found that the record demonstrated that Ivey needed *more* restrictions than the non-examining state

physicians previously had opined. Doc. 11-3 at 25.

In short, the ALJ provided a comprehensive review of Ivey's medical records and considered Ivey's testimony about his own abilities and limitations. Doc. 11-3 at 23–24. The ALJ gave a detailed and specific explanation of why Ivey's testimony about the limitations caused by his symptoms was not consistent with the record; the ALJ did not simply present a broad rejection of Ivey's testimony. *See Dyer*, 395 F.3d at 1210. Thus, the ALJ's decision included the necessary "explicit and adequate reasons" for discrediting Ivey's subjective testimony about his symptoms (*Wilson*, 284 F.3d at 1225), and also accounted for Ivey's subjective testimony in the RFC determination based on consideration of all of the evidence (20 C.F.R. § 404.1529).

In this regard, substantial evidence supported the ALJ's decision. Throughout the record, there is evidence that calls into question Ivey's testimony about the severity of his symptoms and limitations. First, the record shows that multiple instances of imaging showed primarily mild abnormalities. Doc. 11-8 at 5, 23, 41–43, 65–66; Doc. 11-9 at 76–77, 88. Moreover, Ivey typically had normal range of motion, strength, gait, and coordination without significant motor or sensory deficits. Doc. 11-8 at 5–6, 14–15, 23, 33, 56–60; Doc. 11-9 at 14, 20, 23, 31, 48. Ivey also did not report debilitating back or neck pain when he went to Family First in October 2018 (Doc. 11-8 at 70–71), and had only a sprain with mild pain when he went to

the emergency department with back pain in October 2019 (Doc. 11-9 at 30–32).

Importantly, throughout Ivey's longstanding treatment with Dr. Smith, Dr. Smith opined on many occasions that Ivey could return to work, typically at full duty with no limitations, though occasionally with some limitations.  Doc. 11-8 at 23; Doc. 11-9 at 8, 11–12, 16–18, 20–22, 45–46, 49.  Even when Ivey stated that he wanted surgery,[2] Dr. Smith opined that Ivey could return to work at light duty.  Doc. 11-9 at 42, 46.  Further, Dr. Hester, to whom Ivey went for a second opinion, only stated that Ivey could not perform heavy lifting or vigorous activity, not that he had any further limitations.  Doc. 11-9 at 83.  Advantage Physical Therapy also discharged Ivey with only some limitations.  Doc. 11-8 at 75.  Additionally, Ivey stated in his function report that he could drive, shop for groceries, and do some occasional chores.  Doc. 11-7 at 25–26.

The contradictions between the record and Ivey's testimony support the ALJ's decision not to credit Ivey's testimony about the persistence, intensity, and limiting effects of his pain.  In fact, the record shows that multiple physicians opined that Ivey was not disabled and could return to work.  Those physician opinions,

---

[2] Ivey's brief suggests that the ALJ should have addressed whether he "need[ed] any surgeries."  Doc. 15 at 14.  But the question before the ALJ was whether Ivey was disabled under the relevant legal framework.  20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *Winschel*, 631 F.3d at 1178.  As discussed above in text, substantial evidence supported the ALJ's finding that Ivey was not disabled under the Social Security Act.

particularly Dr. Smith's opinions, contradict Ivey's argument that he cannot work because his condition is worsening and he needs surgery but cannot have surgery due to issues with worker's compensation (*e.g.*, Doc. 15 at 14–15). Therefore, the record contains sufficient evidence calling into doubt Ivey's testimony, and the ALJ was not "clearly wrong" to discredit his testimony. *See Werner*, 421 F. App'x at 939.

In sum, there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Ivey's testimony was not consistent with the record, and that Ivey was not disabled. *See Crawford*, 363 F.3d at 1158 (where there is substantial evidence, a court must affirm the ALJ's decision, "[e]ven if the evidence preponderates against the Commissioner's findings" (quoting *Martin*, 894 F.2d at 1529)). Accordingly, substantial evidence supported the ALJ's decision.

## CONCLUSION

The court is sympathetic to what Plaintiff Ivey's brief characterizes as the "catch-22" in which he finds himself. Doc. 15 at 11. But, for the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the

Commissioner's decision.  The court separately will enter final judgment.

**DONE** and **ORDERED** this September 6, 2022.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE